Willie A. HUTCHINGS, Plaintiff-
Appellant,

v.

UNITED STATES INDUSTRIES, INC.,
Defendant-Appellee.

No. 28750.

United States Court of Appeals,
Fifth Circuit.

June 19, 1970.

Fred J. Finch, Jr., Dallas, Tex., for appellant.

Charles F. Potter, Tyler, Tex., James T. Wright, Houston, Tex., for appellee.

Russell Specter, Acting Gen. Counsel, Philip B. Sklover, Julia Cooper, Equal Employment Opportunity Commission, Washington, D. C., amicus curiae.

Before BELL, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Willie A. Hutchings commenced this action against United States Industries, Inc. (the Company) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* He charged that on two occasions the Company denied him a promotion solely because of his race or color. The District Court granted the Company's motion for a summary judgment. This appeal by Hutchings principally requires us to determine whether an employee who has utilized the grievance-arbitration machinery available to him under a collective bargaining agreement should be deemed to have made an election of remedies in seeking redress under the law of the shop, thereby waiving his right to a Title VII remedy in the federal courts. Issues involving the time period within which charges of discrimination must be filed with the EEOC as a precondition to court action and the applicability of rules of res judicata in Title VII cases are also presented.

Plaintiff, a Negro, was originally employed by the Company at its Petroleum Equipment Division in Longview, Texas, in 1961. The Company is engaged in the manufacture and marketing of metal products used in oil field production pumps. Hutchings was initially employed in the Foundry Casting Department as a

Casting Machine Operator. At least until this lawsuit was filed, he was classified as a Metal Pourer in the Department and was paid $2.79 per hour. Employees classified as "leadmen" in the Department retain and accumulate seniority in their basic job classifications, but receive a rate of pay that is 20¢ above the hourly rate of the highest classification led. It is the job of leadman at $2.99 per hour for which Hutchings twice applied and the denial of which he alleges was twice based upon racial grounds.

Employees at the Company's Longview Plant are unionized. In 1964 the Company signed a collective bargaining agreement with two local lodges of the International Association of Machinists, AFL–CIO. This agreement covered all production and maintenance hourly rated employees at the Longview Plant, with exceptions not relevant here. The agreement gives each employee company seniority and classification seniority. With respect to promotions, the agreement provides that seniority, skill, and ability in the next lower-rated job classification or classifications in the same seniority group will be given preference before new employees are hired. If skill and ability are relatively equal, seniority will prevail.[1] Disputes involving promotions are subject to resolution under the grievance-arbitration machinery at the Longview Plant. Article IV of the agreement establishes a three-step grievance procedure for the settlement of employees' grievances. If agreement is reached at any of three steps, the matter is ended there.[2] Article V of the agreement

1. Section 8.5 of article VIII of the agreement reads:

 "8.5 PROMOTIONS. In the matter of promotions seniority, skill and ability of employees in the next lower rated job classification/s in the same seniority group will be given preference prior to hiring new employees. Skill and ability being relatively equal seniority will prevail. In the event no employee in the next lower rated job classification is selected, employees in other lower rated job classification in the same seniority group will be considered in line with their seniority, skill and ability. In the event an employee is unable to perform the work required after a reasonable trial, he will be returned to his former job classification.

 "(a) Skill and ability of employees will be judged by the foreman and shop superintendent and the shop steward and shop committeeman in the plant area involved. Disputes regarding skill and ability of employees will be taken up at the third step of the grievance procedure.

 "(b) If no agreement is reached at the third step of the grievance procedure the matter may be submitted to arbitration in accordance with Article V of this Agreement."

2. Section 4.2 of article IV of the agreement reads:

 "4.2 Prior to filing a written grievance an employee must, with or without his steward, orally discuss the subject matter of his complaint with his foreman. If the complaint is not satisfactorily settled by the discussion, then the employee or employee's steward may reduce the complaint to writing. His steward will present it to the employee's immediate supervisor. When a complaint is reduced to writing it becomes a grievance and an earnest effort will be made to settle it in accordance with the following procedure that must be followed:

 "(a) First step—The employee's shop steward will present the written grievance to the aggrieved employee's immediate supervisor. The grievance must be written on the form provided and must cite the specific articles and sections of this agreement which are in dispute. The immediate supervisor's answer will be given in writing on the form provided to the shop steward that presented the grievance within three (3) working days of its receipt. If the answer is satisfactory, the grievance shall be marked 'settled' by the employee's shop steward. If the answer is not satisfactory, the grievance must be so marked and appealed to the second step of this procedure by notifying the designated management representative in writing on the form provided within three (3) working days of the receipt of the immediate supervisor's answer.

 "(b) Second step—The designated management representative will arrange a meeting to discuss the appealed grievance. The meeting must be held within five (5) work days of the receipt of the appeal by the designated management representative.

states that grievances will be considered settled by means of the procedures established in article IV unless they are submitted to arbitration within ten days after completion of the "third step" in the article IV procedure. After arbitration, the arbitrator's decision is to be "final and binding on both parties, the Company and the Union," and this decision is to be based solely upon the terms and conditions of the agreement and the evidence presented to the arbitrator. Together, articles IV and V are to "constitute the sole and exclusive method of determination, decision, adjustment or settlement between the parties of any and all grievances and * * * will constitute the sole and exclusive remedy to be utilized by either party for any and all grievances."

In early 1966, the position of leadman on the night shift was temporarily opened. Hutchings applied for this position. The position was thereafter assigned to a white man having less experience and seniority than Hutchings. Hutchings then made a grievance complaining of the awarding of the job to the less senior employee. This grievance was prosecuted through the "third step" of the grievance procedure, at which step the grievance was decided against Hutchings. The matter was not then submitted to arbitration. Instead, on March 1, 1966, Hutchings filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC). This charge was based upon the Company's denial of the promotion to him and was filed within ninety days after the allegedly discriminatory acts occurred.

In September 1966, the leadman on the day shift resigned, and Hutchings applied for his position. The Company did not question Hutchings's ability to perform as a leadman. It did, however, abolish the position. On the ground that the position Hutchings sought no longer existed, his application for promotion was denied. Hutchings again made a grievance. This time, the grievance was prosecuted through all three steps in the grievance procedure and was then submitted to arbitration. On February 18, 1967, the arbitrator determined that the Company did not, under then existing operating conditions at the Longview Plant, violate the collective bargaining agreement in not replacing the services of the resigned leadman with those of Hutchings in the leadman classification. On March 6, 1967, Hutchings filed a second charge with the EEOC. This charge was based upon the Company's discontinuation of the leadman classification after

Those eligible to be present at the meeting to discuss the appealed grievance are the employee's shop committeeman, and the designated management representative. By mutual agreement the aggrieved employee and/or his shop steward may be present at this meeting. Within three (3) work days after meeting, the designated management representative will present his answer in writing to the employee's shop committeeman. If the answer is satisfactory, the grievance shall be marked 'settled' by the employee's shop committeeman. If the answer is not satisfactory, the grievance must be so marked and appealed to the third step of this procedure by notifying the Company's director of industrial relations in writing on the form provided within three (3) work days of the receipt of the answer.

"(c) Third step—The director of industrial relations will arrange a meeting to discuss the appealed grievance. The meeting must be held within five (5) work days of the receipt of the appeal by the director of industrial relations. Those eligible to be present at the meeting to discuss the appealed grievance are the chairman of the shop committee, (applies to Local Lodge 1923 grievances only), the employee's shop committeeman, a representative of the International Union, and designated management representatives. By mutual agreement the aggrieved employee and/or his shop steward may be present at this meeting. Within three (3) work days after this meeting, the director of industrial relations, or his designated representative, will present the Company's answer in writing to the chairman of the shop committee."

Hutchings had applied for the vacant position. It was filed some 154 days after the allegedly discriminatory acts occurred.

Having considered Hutchings's two charges, the EEOC concluded that reasonable cause existed to believe that the Company was in violation of section 703 (a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a).[3] After the Commission had failed to obtain the Company's voluntary compliance with Title VII, it notified Hutchings that he was entitled to bring a civil action against the Company. This suit followed.

In the court below, Hutchings claimed that the Company had discriminated against him in violation of Title VII by refusing to promote him to the position of leadman because of his race on two occasions, first in February 1966 and second, in October 1966. As indicated above, Hutchings had previously unsuccessfully invoked his contractual grievance remedies with respect to both occurrences. In addition to these alleged acts of discrimination, Hutchings claimed that the Company has, since October 1966, continually required him to perform leadman functions without either promoting him or paying him for this additional work. He requested that the District Court order that he be promoted and paid for his loss of wages and that the Company be enjoined from performing further acts of racial discrimination against him.

The District Court granted the Company's motion for a summary judgment in its favor. The Court concluded that Hutchings could not maintain a Title VII action based upon the allegedly unlawful denial of a promotion in October 1966 because Hutchings had not filed a charge of discrimination with the EEOC regarding this occurrence within the time prescribed by the statute. Civil Rights Act of 1964, Title VII, § 706(d), 42 U.S.C. § 2000e–5(d) (90 days). The Court further concluded that Hutchings could not maintain a Title VII action based upon either the October or the February denials of a promotion because Hutchings had, in effect, made a binding election of remedies by pursuing to final determinations the processing of his grievances through the grievance-arbitration machinery established at the Longview Plant. Hutchings could not thereafter, the Court decided, pursue a Title VII remedy based upon the claims already privately concluded adversely to him. *See* Newman v. Avco Corp., Aerospace Structures Division, M.D. Tenn., 1970, 313 F.Supp. 1069 [Civ. No. 5258, March 26]; Edwards v. North American Rockwell Corp., C.D.Cal., 1968, 291 F.Supp. 199; Washington v. Aerojet-General Corporation, C.D.Cal., 1968, 282 F.Supp. 517.

For reasons that follow, we hold that the Company was not entitled to a judgment in its favor as a matter of law. Under the circumstances of this case, we conclude that the statute of limitations applicable to the filing of charges with the EEOC, Civil Rights Act of 1964, Title VII, § 706(d), 42 U.S. C. § 2000e–5(d),[4] was tolled once Hutch-

---

3. This subsection reads:
 "(a) It shall be an unlawful practice for an employer—
 "(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 "(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

4. This subsection reads:
 "(d) A charge under subsection (a) of this section shall be filed within ninety days after the alleged unlawful employment practice occurred, except that in the case of an unlawful employment practice with respect to which the person aggrieved has followed the procedure set out in subsection (b) of this section, such charge shall be filed by the person aggrieved within two hundred

ings invoked his contractual grievance remedies in an effort to obtain a private settlement of his complaint. Culpepper v. Reynolds Metals Company, 5 Cir., 1970, 421 F.2d 888, 891. Invocation of those remedies, moreover, did not have the effect of barring Hutchings from seeking a Title VII remedy in the federal courts. *See* Bowe v. Colgate-Palmolive Company, 7 Cir., 1969, 416 F.2d 711. Therefore, we reverse the judgment of the District Court and remand this case for further proceedings not inconsistent with this opinion.

The statute of limitations question presented on this appeal is controlled by our recent decision in Culpepper v. Reynolds Metals Company, 5 Cir., 1970, 421 F.2d 888, in which we held that the statute is tolled "once an employee invokes his contractual grievance remedies in a constructive effort to seek a 'private settlement of his complaint.'" *Id.* at 891. Therefore, we need discuss here only whether Hutchings is precluded from maintaining this action under Title VII because he first utilized the Plant's grievance-arbitration machinery to prosecute his rights under the collective bargaining agreement governing the conditions of his employment by the Company. This determination requires that we consider, in the context of the enforcement procedures established by Title VII, the role privately fashioned grievance-arbitration processes are to play in the elimination of racial discrimination in employment.

Racial discrimination in employment affects the individual's ability to provide decently for himself and his family in a job or profession for which he qualifies and which he chooses. Culpepper v. Reynolds Metals Company, 5 Cir., 1970, 421 F.2d 888, 891. Title VII of the Civil Rights Act of 1964 reflects Congress's concern over the social and economic consequences of such discrimination in employment. Implicit in its provisions is

the recognition that economic citizenship is today's passport to political and social citizenship. *See* Affeldt, Title VII in the Federal Courts, 14 Vill.L.Rev. 664, 665 (1969).

 Section 703(a) of Title VII, makes it an unlawful employment practice for an employer (1) to hire, discharge, or interfere in any other way with the terms and conditions of employment of an individual because of that individual's race or (2) to limit, segregate, or classify his employees in any way that would deprive or tend to deprive an individual of employment opportunities or otherwise to affect adversely his status as an employee because of his race. 42 U.S.C. § 2000e–2(a) (1)–(2). From a reading of the provisions enacted to effectuate this section, it is clear that Congress placed great emphasis upon private settlement and the elimination of unfair practices without litigation, Oatis v. Crown Zellerbach Corporation, 5 Cir., 1968, 398 F.2d 496, 498, on the ground that voluntary compliance is preferable to court action. Dent v. St. Louis-San Francisco Railway Company, 5 Cir., 1969, 406 F.2d 399, 402. Indeed, it is apparent that the primary role of the EEOC is to seek elimination of unlawful employment practices by informal means leading to voluntary compliance. *See* Fekete v. United States Steel Corp., 3 Cir., 1970, 424 F.2d 331. Before an individual can initiate an action in federal court under Title VII, he must first have filed a charge with the Commission and then have received statutory notice from the Commission that it has, for whatever reason, been unable to secure voluntary compliance by the employer. Having received the notice, regardless of the EEOC's action or inaction, Miller v. International Paper Company, 5 Cir., 1969, 408 F.2d 283, 291, the individual has perfected his right to seek judicial consideration of his grievance.

and ten days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local

law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency."

■ To the federal courts alone is assigned the power to enforce compliance with section 703(a), and the burden of obtaining enforcement rests upon the individual claiming to have been aggrieved by its violation. Pettway v. American Cast Iron Pipe Company, 5 Cir., 1969, 411 F.2d 998, 1005. The EEOC, unlike so many governmental agencies, was not empowered to enforce the Act it was established to administer. Although the Commission can subpoena witnesses, hold hearings, and attempt to resolve employment disputes by conciliation, conferences, and persuasion, it has no authority to issue orders or compel enforcement. Moreover, except in "pattern or practice" situations [5] or cases of "general public importance," [6] the Government does not enter Title VII litigation, and the individual must seek relief on his own in an action against the employer. Accordingly, in the usual Title VII case, when conciliation has not been effected and the preconditions to court action have been satisfied, "that individual, often obscure, takes on the mantel of the sovereign," Jenkins v. United Gas Corporation, 5 Cir., 1968, 400 F.2d 28, 32. *See also* Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 401, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). When, as frequently is the case, the alleged discrimination has been practiced upon the plaintiff because he is a member of a class that is allegedly discriminated against, the court trying a Title VII suit bears a special responsibility in the public interest to resolve the employment dispute by determining the facts regardless of the individual plaintiff's position, Bowe v. Colgate-Palmolive Company, 7 Cir., 1969, 416 F.2d 711, 715, for "[w]hether in name or not, the suit is perforce a sort of class action for fellow employees similarly situated." Jenkins v. United Gas Corporation, 5 Cir., 1968, 400 F.2d 28, 33. Section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), authorizes appropriate judicial relief from unlawful discriminatory practices.[7] We have said:

"* * * In formulating relief from such practices the courts are not limited to simply parroting the Act's prohibitions but are permitted, if not required, to 'order such affirmative action as may be appropriate.' The District Court was invested with a large measure of discretion in modeling its decree to ensure compliance with the Act, and this Court will not interfere with that discretion except for an abuse thereof. Where necessary to ensure compliance with the Act, the District Court was fully empowered to eliminate the present effects of past discrimination."

Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 5 Cir., 1969, 407

---

5. Civil Rights Act of 1964, Title VII, § 707, 42 U.S.C. § 2000e–6 (civil actions by the Attorney General).

6. Civil Rights Act of 1964, Title VII, § 706(e), 42 U.S.C. § 2000e–5(e) (intervention by Attorney General).

7. This subsection reads:
"(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice). Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex or national origin or in violation of section 2000e–3(a) of this title."

F.2d 1047, 1052–1053 (citations and footnotes omitted).[8] *See also* Local 189, United Papermak. & Paperwork. v. United States, 5 Cir., 1969, 416 F.2d 980. Confidence, to the extent that Congress was willing to dispense it, reposes finally with the federal courts. *See* Platt, The Relationship Between Arbitration and Title VII of the Civil Rights Act of 1964, 3 Ga.L.Rev. 398, 403 (1969).

■ Against this backdrop and in the specific context of this case, we consider the function of privately tailored grievance-arbitration procedures in the resolution of employment disputes involving charges of racial discrimination. Two occurrences provide the basis for Hutchings's charge that the Company has committed certain employment practices in violation of section 703(a) of Title VII. These same occurrences provided the basis for the grievances Hutchings prosecuted through the grievance-arbitration machinery at the Longview Plant. The collective bargaining agreement under which these grievances were prosecuted provides that its provisions are to be applied to all employees without regard to their race. Therefore, this is clearly a case in which the matters in dispute were subject to the concurrent jurisdiction of the federal courts under the scheme of Title VII and of the grievance-arbitration machinery established by the bargaining contract. The District Court concluded that Hutchings, by pursuing his contractual remedies to final or "settled" determinations under the bargaining contract, was bound by those adverse determinations in this Title VII action and, accordingly, could not prevail against the Company. We disagree. An arbitration award, whether adverse or favorable to the employee, is not per se conclusive of the determination of Title VII rights by the federal courts, nor is an intermediate grievance determination deemed "settled" under the bargaining contract to be given this effect.

■ Title VII is silent on the role that private grievance-arbitration procedures under a collective bargaining agreement are to play in the resolution of employment disputes involving racial discrimination. Thus the task of discerning "legislative intent" rests upon the sound application of judicial principles and precedents. Fekete v. United States Steel Corp., 3 Cir., 1970, 424 F.2d 331.

We begin by recognizing that determinations under a contract grievance-arbitration process will involve rights and remedies separate and distinct from those involved in judicial proceedings under Title VII. These dissimilarities are clearly seen through a comparison of the role of the federal court in Title VII cases and the role of the arbitrator in the grievance-arbitration process.

■ The trial judge in a Title VII case bears a special responsibility in the public interest to resolve the employment dispute, for once the judicial machinery has been set in train, the proceeding takes on a public character in which remedies are devised to vindicate the policies of the Act, not merely to afford private relief to the employee. *See* Pettway v. American Cast Iron Pipe Company, 5 Cir., 1969, 411 F.2d 998; Bowe v. Colgate-Palmolive Company, 7

8. Under the enforcement scheme of Title VII, the federal courts, like the National Labor Relations Board under the National Labor Relations Act, determine whether conduct violates the statute and decide the relief appropriate to vindicate the public interest. *Compare* Civil Rights Act of 1964, Title VII, § 706(g), 42 U.S. C. § 2000e–5(g), *with* Labor Act § 10(c), 29 U.S.C. § 160(c). On the Labor Board's power under § 10(c), the Supreme Court has stated:

"* * * [T]he Board has wide discretion in ordering affirmative action; its power is not limited to the illustrative example of one type of permissible affirmative order, namely, reinstatement with or without back pay. The particular means by which the effects of unfair labor practices are to be expunged are matters 'for the Board not the courts to determine.'" Virginia Electric & P. Co. v. N.L.R.B., 319 U.S. 533, 539, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943) (citation omitted).

**312**

Cir., 1969, 416 F.2d 711; *cf.* N. L. R. B. v. George E. Light Boat Storage, Inc., 5 Cir., 1967, 373 F.2d 763, 767–768; United Steelworkers v. American International Aluminum Corp., 5 Cir., 1964, 334 F.2d 147, 152. At issue in the Title VII proceeding is the statutory right of employees or prospective employees not to be discriminated against on racial or other unlawful grounds regarding matters of their employment. In formulating relief once a violation has been found, the trial judge is invested with wide discretion in modeling his decree to ensure compliance with the Act. Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 5 Cir., 1969, 407 F.2d 1047.

The arbitrator's role in the grievance-arbitration process, on the other hand, is to carry out the aims of the agreement that he has been commissioned to interpret and apply, and his role defines the scope of his authority. Brotherhood of Railroad Train. v. Central of Ga. Ry. Co., 5 Cir., 1969, 415 F.2d 403, 412.

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."

United Steelwkrs. of A. v. Enterprise W. & C. Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). *See also* Brotherhood of Railroad Train. v. Central of Ga. Ry. Co., 5 Cir., 1969, 415 F.2d 403; Diamond v. Terminal Railway Alabama State Docks, 5 Cir., 1970, 421 F.2d 228. To merit judicial enforcement, the arbitrator's award "must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement," Brotherhood of Railroad Train. v. Central of Ga. Ry. Co., 5 Cir., 1969, 415 F.2d 403, 412, and an award based "solely upon the arbitrator's view of the requirements of enacted legislation [such as Title VII]" exceeds the scope of the submission. United Steelwkrs. of A. v. Enterprise W. & C. Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). In the arbitration proceeding, then, the arbitrator's role is to determine the contract rights of the employees, as distinct from the rights afforded them by enacted legislation such as Title VII. The arbitration process is a private one essentially tailored to the needs of the contracting parties, who have agreed upon this method for the final adjustment of disputes under their contract. The arbitrator, in bringing his informed judgment to bear on the problem submitted to him, may consider himself constrained to apply the contract and not give the types of remedies available under Title VII, even though the contract may contain an anti-discrimination provision. Conversely, of course, a court may not be able to delve into all the ramifications of the contract, as viewed under the law of the shop, or to afford some types of relief privately available through arbitration. Bowe v. Colgate-Palmolive Company, 7 Cir., 1969, 416 F.2d 711, 715.

In view of the dissimilarities between the contract grievance-arbitration process and the judicial process under Title VII, it would be fallacious to assume that an employee uti-

lizing the grievance-arbitration machinery under the contract and also seeking a Title VII remedy in court is attempting to enforce a single right in two forums. We do not mean to imply that employer obligations having their origin in Title VII are not to be incorporated into the arbitral process. When possible they should be. *See generally* Gould, Labor Arbitration of Grievances Involving Racial Discrimination, 118 U. Pa.L.Rev. 40 (1969). But the arbitrator's determination under the contract has no effect upon the court's *power* to adjudicate a violation of Title VII rights.[9]

In Culpepper v. Reynolds Metals Company, 5 Cir., 1970, 421 F.2d 888, this Court stated, in holding that the statute of limitations applicable to the filing of charges with the EEOC was tolled once an employee invokes his contractual remedies to seek a private settlement of his complaint,

> "We do not think that Congress intended for a result which would require an employee, thoroughly familiar with the rules of the shop, to proceed solely with his Title VII remedies for fear that he will waive these remedies if he follows the rules of the shop or to do both simultaneously, thereby frustrating the grievance procedure."

*Id.* at 891–892. *Culpepper* did not reach the issue whether an employee who fol-lows the shop rules without success thereby waives his Title VII remedies, but much of its reasoning is applicable here. We do not think that Congress intended that an employee who unsuccessfully pursues his contractual remedies to conclusion and then files charges with the EEOC is foreclosed from obtaining Title VII relief in court. It is understandable that a union member would first proceed to vindicate any rights he felt he had under the contract. He should not be penalized for so doing, either through the doctrine of election of remedies or through application of rules of res judicata when next he initiates an action under Title VII.

Title VII outlaws certain forms of discrimination in employment. An important method for the fulfillment of congressional purpose is the utilization of private grievance-arbitration procedures. This comports not only with the national labor policy favoring arbitration as the means for the final adjustment of labor disputes, *e. g.*, Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199, but also with the specific enforcement policy of Title VII that discrimination is better curtailed through voluntary compliance with the Act than through court orders. Congress, however, has made the federal judiciary, not the EEOC or the private arbitrator, the *final* arbiter of an individual's Title VII

9. Under the Labor Act, when substantially the same conduct would constitute a violation of the bargaining contract and an unfair labor practice,

> " * * * [t]he distinguishing point is that, while an act may be both an arbitrable contract violation *and* an unfair labor practice, a 'breach of contract *is not* an unfair labor practice'; the former is enforced by the courts, the latter by the Board; the former gives to private parties a remedy, the latter uses a private right to effectuate the declared policies of the Act; the former gives a certainty of decision, the latter leaves decision discretionary. * * * Since the Board's power is plenary in all respects, 'neither the existence of an agreement to arbitrate nor a rendered award can preclude the Board from exercising its statutory jurisdiction.' But certainly an award or an agreement to arbitrate may serve to temporarily assuage the aggrieved party and afford validity to contract terms (even including unfair labor practices) until a final disposition of the matter of unfair labor practice be made by the Board. Even though the Board is not bound by an arbitration award, it may find that compliance with the award is not violative of the Act, or it may even, in the exercise of its discretionary power, decline action because an award has been made or arbitration is possible."

Lodge No. 12, etc. v. Cameron Iron Works, 5 Cir., 1958, 257 F.2d 467, 473 (footnotes omitted); see United Steelworkers v. American Internat'l Aluminum Corp., 5 Cir., 1964, 334 F.2d 147, 152–153.

grievance. *See* Fekete v. United States Steel Corp., 3 Cir., 1970, 424 F.2d 331. The EEOC serves to encourage and effect voluntary compliance with Title VII. So also may the private arbitrator serve consistent with the scope of his authority. Neither, however, has the power to make the ultimate determination of Title VII rights.

▇▇▇▇ In this case, we conclude that the District Court erred in holding that Hutchings was bound by the arbitrator's adverse determination regarding the October denial of a promotion and by the settled "third step" determination regarding the February denial. If the doctrine of election of remedies is applicable at all to Title VII cases, it applies only to the extent that the plaintiff is not entitled to duplicate relief in the private and public forums which would result in an unjust enrichment or windfall to him. Bowe v. Colgate-Palmolive Company, 7 Cir., 1969, 416 F.2d 711. Hutchings, of course, has received nothing to date. Since this case involves Hutchings's assertion of his Title VII rights, while the grievance and arbitration proceedings involved his assertion of contract rights, res judicata is inapplicable to this proceeding.[10] *Cf.* New Orleans Typographical Union No. 17 v. N. L. R. B., 5 Cir., 1966, 368 F.2d 755, 765. It remains to be determined whether Hutchings has been the victim of a Title VII violation.

Reversed and remanded.

10. Because the rights and remedies at issue in the grievance or arbitration proceeding and the rights and remedies at issue in the Title VII case differ, the arbitrator's award or grievance determination certainly are not binding upon the court. This does not mean, however, that the award or determination ought to be disregarded altogether. The courts should evaluate both awards and grievance determinations or settlements in deciding Title VII issues of violations and relief. That is, the awards and determinations may properly be considered as evidence. *E. g.*, United States v. H. K. Porter Company, N.D.Ala., 1968, 296 F.Supp. 40, 109–110; *see* Gould, Labor Arbitration of Grievances Involving Racial Discrimina-

tion, 118 U.Pa.L.Rev. 40, 57 (1969). The record in this case does not reveal whether Title VII rights, or similar contractual rights, were ever considered during the processing of Hutchings' grievances. The arbitrator, for example, did not purport to apply these rights to the problem submitted (it does not appear whether the issue was raised), and the record does not show what evidence he considered or the procedures that were followed. In view of the state of this record, we leave for the future the question whether a procedure similar to that applied by the Labor Board in deferring to arbitration awards when certain standards are met might properly be adopted in Title VII cases.