Robert F. NEWMAN and Ramsey Alexander, Plaintiffs,

and

Raymond L. Dennis and Warner McCreary, Plaintiffs-Intervenors,

v.

AVCO CORPORATION–AEROSPACE STRUCTURES DIVISION, NASHVILLE, TENNESSEE, and Aero Lodge No. 735, International Association of Machinists and Aerospace Workers, AFL–CIO, Defendants.

Civ. A. Nos. 4335, 5258.

United States District Court,
M. D. Tennessee,
Nashville Division.

Dec. 18, 1973.

Avon N. Williams, Jr., Richard H. Dinkins, Robert Belton, Nashville, Tenn., Jack Greenberg, Peter Sherwood, New York City, for plaintiffs.

Carroll D. Kilgore, Cecil D. Branstetter, William Waller, Nashville, Tenn., Donald A. Banta, Chicago, Ill., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

These suits are brought as class actions alleging discriminatory racial practices and policies of the defendants with respect to classification of employees, training, promotions, transfers, working conditions, compensation and terminations pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–15; 42 U.S.C. §§ 1981 and 1985; 28 U.S.C. § 1343(1) and (4); and 29 U.S.C. §§ 151, *et seq.* These suits were consolidated by the court pursuant to Rule 42(a), Fed.R.Civ.P., with plaintiffs as representatives of one class under Rule 23, Fed.R.Civ.P. These consolidated suits were heard on their merits beginning June 26, 1972, and ending August 5, 1972.

Civil Action No. 4335 was originally filed by Ramsey Alexander setting forth the above allegations, and by order of the court Raymond L. Dennis and Warner McCreary were permitted to intervene as plaintiffs. Civil Action No. 5258 was originally filed by Robert F. Newman with similar allegations, and the two cases were consolidated for trial by order of this court. Alexander is still employed by defendant Avco and is a member of Aero Lodge No. 735. Dennis, McCreary and Newman are former employees of the defendant Avco and are former members of the defendant union, Aero Lodge No. 735.

Robert F. Newman filed this suit on December 30, 1968, as a class action alleging racially discriminatory policies and practices on the part of defendant Avco Corporation and defendant Aero Lodge No. 735 in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This District Court granted defendants' motions for summary judgment on March 26, 1970. *Newman v. Avco Corp.-Aerospace Str. Div., Nashville, Tenn.*, 313 F.Supp. 1069 (M.D. Tenn.1970). The District Court ruled that plaintiff Newman had made a binding election of remedies by pursuing the collective bargaining agreement to a final conclusion by the arbitrator, and dismissed the class action suit.

This ruling was reversed by the Sixth Circuit Court of Appeals on October 27, 1971, *Newman v. Avco Corp.-Aerospace St. Div., Nashville, Tenn.*, 451 F.2d 743 (6th Cir. 1971), the Court ruling that the election of remedies doctrine was not applicable to Title VII actions. The Court further stated:

> In short, major aspects of this District Court complaint were either not submitted to arbitration or were beyond the arbitrator's power of decision. To such issues plainly neither the doctrine of res judicata nor collateral estoppel can apply. *Id.*, at 748.

The Court noted that "[n]owhere in the labor-management agreement is there any prohibition against race discrimination in hiring, employment, promotion or discharge." *Id.*

The Court of Appeals concluded that "this case must be reversed and remanded to the District Court to take testimony and enter findings of facts and conclusions of law upon appellant's charges of unfair representation by respondent union, in violation of Title VII, Sec. 703(c)(1) and upon appellant's charges of violations of Title VII, Sec. 703(a)(1) by respondent Avco as set forth above." *Id.* at 749.

Title VII, Sec. 703(a)(1) provides:

> § 2000e–2. Unlawful employment practices—Employer practices
>
> (a) It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of em-

ployment, because of such individual's race, color, religion, sex, or national origin;

42 U.S.C. § 2000e–2(a)(1).

Title VII, Sec. 703(c)(1) provides:

(c) It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

42 U.S.C. § 2000e–2(c)(1).

Plaintiff Newman was discharged by defendant Avco on February 1, 1966. On February 2, 1966, plaintiff signed a grievance protesting his discharge and seeking reinstatement. This grievance was filed with Avco by defendant union. Plaintiff Newman amended the grievance five days later on February 7, 1966, to allege that his discharge was racially motivated. After the defendant union, Aero Lodge No. 735, refused to allege racial discrimination in the grievance, plaintiff retained an attorney to argue his racial discrimination before the arbitrator at the hearing on April 21, 22, 1966. Plaintiff filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") against both defendant Avco Corporation and defendant Aero Lodge No. 735 on May 2, 1966. The arbitrator rendered his decision unfavorable to plaintiff on all grounds on June 28, 1966.

Plaintiff Newman filed this suit in federal court on December 30, 1968, after the EEOC notified him that there was reasonable cause to believe that he had been the subject of unlawful discrimination by Avco Corporation and Aero Lodge No. 735.

Plaintiff Ramsey Alexander signed and forwarded a formal charge of racial discrimination with the EEOC on September 8, 1965. The EEOC determined that there was reasonable cause to believe that Avco Corporation and Aero Lodge No. 735 had engaged in unlawful employment practices within the meaning of § 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The EEOC, by letter dated December 13, 1965, and received on or about December 17, 1965, advised plaintiff Alexander that conciliation efforts had failed and that he could institute suit in federal court within thirty days from the receipt of the letter. Plaintiff Alexander filed this suit in federal court on January 13, 1966. Plaintiff Alexander did not attempt to utilize the grievance procedure. In this regard the court notes that the collective bargaining agreements between Avco and the union at the time, and prior to the time, Alexander filed this suit contained no prohibition against racial discrimination by the employer Avco Corporation or by defendant union.

Raymond L. Dennis, who filed a charge with the EEOC against defendants Avco Corporation and Aero Lodge No. 735, alleges in this intervening complaint that he was discharged by AVCO for racial reasons on January 26, 1971. Dennis alleges that Aero Lodge No. 735 discriminatorily refused to fully and fairly represent him in challenging his discharge.

Warner McCreary alleges in his intervening complaint that he was discriminatorily suspended for protesting against what he believed was Avco's racially discriminatory firing of co-intervenor Raymond L. Dennis. McCreary alleges that defendant Aero Lodge No. 735 discriminatorily represented McCreary in this matter by refusing to protest and challenge this alleged racially discriminatory suspension.

On June 1, 1971, Dennis and McCreary filed a motion to intervene as plaintiffs pursuant to Rule 24, Fed.R.Civ.P. This court, on July 29, 1971, allowed Dennis to intervene to obtain both injunctive and individual relief. The court allowed McCreary to intervene solely for injunctive relief. McCreary filed a notice of appeal of the court's order; however, his appeal was subsequently voluntarily dismissed on December 29, 1971.

■ The court must initially determine whether this suit is properly maintained as a class action, and if so, define the class and determine whether or not the plaintiffs may properly represent the class. The allegations of the Alexander complaint with

the EEOC and those of the Newman complaint with the EEOC are practically identical, except that Newman alleges additionally a racially motivated discharge. On appeal in the Newman case, the Sixth Circuit Court of Appeals stated:

We conclude that this case must be reversed and remanded to the District Court to take testimony and enter findings of fact and conclusions of law upon appellant's charges of unfair representation by respondent union, in violation of Title VII, § 703(c)(1) and upon appellant's charges of violation of Title VII, § 703(a)(1) by respondent Avco, as set forth above. As to these latter charges, appellant is an appropriate representative of the class described in the complaint and the class action aspect of this suit must likewise be the subject of hearing, findings and conclusions. [Citing cases.]
*Newman v. Avco Corp.-Aerospace St. Div., Nashville, Tenn., supra,* at 749.

The Sixth Circuit Court of Appeals construed plaintiff Newman's judicial complaint as follows:

We read appellant's complaint as alleging a long-standing conspiracy to maintain a system of race discrimination participated in by both company and union (the contracting parties which created the arbitration machinery and chose the arbitrator), an element totally lacking in *Dewey* [v. *Reynold's Metal's Co.*, 429 F.2d 324 (6th Cir. 1970) 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971)]. . . . This totality of circumstances appears to represent a fundamental attack upon the fairness and impartiality of the arbitration proceeding and specifically to represent an allegation of bad faith against defendant union. (See *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).)
*Id.,* at 747, 748.

Plaintiff Alexander, in his judicial complaint, factually alleges racial discrimination by defendant Avco Corporation in the areas of training, transfers, upgrading opportunities, promotions, wages increases, job classification and reclassification. Alexander charges Aero Lodge No. 735 with

acquiescing and cooperating with Avco Corporation in this alleged discrimination, and with maintaining and pursuing a tacit agreement and/or conspiracy with the defendant Avco Corporation to encourage, permit, enforce, and perpetuate the racially discriminatory employment practices.

Plaintiff Dennis, in his intervening complaint of July 29, 1971, alleges a racially discriminatory discharge on the part of Avco Corporation. He further alleges discrimination by Avco in the areas of initial employment, re-employment, promotions, demotions, transfers, suspensions and terminations. Dennis also alleges that defendant Avco permitted, encouraged, and condoned harassment and mistreatment of black employees by white employees. Dennis alleges that Aero Lodge No. 735 has participated in, encouraged, caused and attempted to cause this racial discrimination.

Plaintiff McCreary asserts in his intervening complaint of July 29, 1971, that he was the victim of a racially motivated suspension by defendant Avco. McCreary claims that he was also subjected to harassment because of his efforts to eliminate racial discrimination at Avco. As to Aero Lodge No. 735, McCreary claims that the union participated in, caused or attempted to cause this racial discrimination to which he was allegedly subjected.

Plaintiff Alexander filed a charge of discrimination with the EEOC on September 8, 1965. Alexander made the following charges of racial discrimination:

4. Please tell your story of discrimination. Explain what unfair thing was done to you.

I have worked as a laborer for about 12 years and as a janitor for about 2 years. I have not been given an opportunity to advance into other maintenance departments as white workers with less experience and seniority. I informed Avco that I had about twenty years experience as a concrete finisher and brick layer. I have been refused these type jobs because of my race. The union, Local 735 Machinists, nor the compa-

ny has informed me of any jobs available that I could bid on in this type work.

Exhibit "A" to Complaint, Civil Action No. 4335.

Plaintiff Robert F. Newman filed a charge of discrimination with the EEOC on May 2, 1966. This charge as summarized in the EEOC decision of July 19, 1967, is as follows:

Charging Party alleges discrimination on the basis of race (Negro) as follows: that he was discharged from his job on the ground of failure to perform satisfactorily; that his request for transfer to another job was denied while a Caucasian employee holding the same job was transferred upon request; that Respondent has refused to reinstate him; and that his union failed to properly represent him in his complaint. *Newman v. Avco Corp.-Aerospace St. Div., Nashville, Tenn., supra*, at 753.

The court concludes that the scope of the investigation which could reasonably be expected to have grown out of the EEOC charges of discrimination against Avco by Alexander and Newman covers discrimination in (a) classification as to the types of employment available to black people, (b) training, (c) working conditions, (d) promotions, (e) transfers, (f) compensation, and (g) terminations. Thus, these charges on discrimination, allegedly violations of 42 U.S.C. § 2000e–2(a)(1), are proper allegations in the judicial complaints filed. The charges of discrimination by Dennis and McCreary in their intervening complaints are within the proper scope of the Alexander and Newman judicial complaints. As to the alleged violations of 42 U.S.C. § 2000e–2(c)(1) by defendant Aero Lodge No. 735, the scope of the Alexander and Newman judicial complaints properly encompasses allegations that defendant Aero Lodge No. 735 unfairly, inadequately, arbitrarily, discriminatorily, and in bad faith failed to properly represent black employees to protect them from discriminatory conduct by Avco in the areas of (a) classification as to the types of employment available to black people, (b) training, (c) working conditions,

(d) promotions, (e) transfers, (f) compensation, and (g) terminations. Thus, provided the requirements of Rule 23(a) and (b)(2) are satisfied, plaintiffs may represent a class consisting of past black employees, present black employees, and prospective black employees of the defendant Avco who have been affected, are affected, or may be affected by these alleged discriminatory practices encompassed within the scope of the EEOC investigations of the charges made by plaintiffs Alexander and Newman.

Plaintiffs and intervenors may properly represent the above defined class provided the requirements of Rule 23(a) and (b)(2) are met. *Oatis v. Crown Zellerbach Corporation*, 398 F.2d 496 (5th Cir. 1968); *Smith v. North American Rockwell Corp.—Tulsa Division*, 50 F.R.D. 515 (N.D.Okl.1970); *Butler v. Local No. 4 and Local No. 269, Laborers' International Union of North America (AFL-CIO)*, 308 F.Supp. 528 (N.D. Ill.1969).

Rule 23(a) and (b)(2), Fed.R.Civ.P., reads as follows:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; . . . .

The numerosity requirement of Rule 23(a)(1) is clearly satisfied as the class includes past, present and prospective black

employees. Also, it is clear that a common question of fact exists as to all members of the class—whether they have been the subject of racially discriminatory employment practices. *Carr v. Conoco Plastics, Inc.*, 423 F.2d 57, 63 (5th Cir. 1970). Also, the claims of the plaintiffs are necessarily typical of the claims of the class they represent. *Butler v. Local No. 4 and Local No. 269, Laborers' International Union of North America (AFL-CIO), supra*, at 533.

The remaining requirement of Rule 23(a) is that plaintiffs will fairly and adequately protect the interests of the class. Rule 23(a)(4).

The court holds that the plaintiffs and intervenors are adequate representatives of the class as defined since their interests are substantially the same as the interests of the members of the class. *Williams v. Humble Oil & Refining Co.*, 234 F.Supp. 985, 987 (E.D.La.1964). If the interests the class representative is protecting for himself individually are substantially coextensive with the interests of the members of the class, the court feels that this representative will ordinarily be an adequate protector of the interests of the class. Clearly the two original plaintiffs, Alexander and Newman, and intervenor Dennis, who seek damages for alleged discriminatory practices, including the discharge of Newman and Dennis, have coextensive interests with the members of the class who allegedly have suffered or may suffer the same experiences. As to intervenor McCreary, he has interests which are coextensive with those of the class who would also benefit from the sought injunctive relief. The plaintiff Newman and the intervenors Dennis and McCreary seek reinstatement, and thus they have an interest in the abolition of racially discriminatory employment practices in the areas defined hereinabove, as to present and prospective black employees.

The court knows of no reason why the plaintiffs and the intervenors, through their counsel, will not properly and adequately represent the interests of the members of the class. Therefore, in the exercise of its discretion, the court holds that plaintiffs will fairly and adequately protect the interests of the class under Rule 23(a)(4).

As to the Rule 23(b)(2) requirement the factual allegations of the complaints are clearly sufficient, as it is alleged that defendants have acted or refused to act on grounds generally applicable to the class, i. e., on the basis of race, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Therefore, the court holds that the plaintiffs and the intervening plaintiffs are proper representatives of a class consisting of past, present and prospective black employees of the defendant Avco Corporation, and past, present and prospective black members of Aero Lodge No. 735, who allegedly have suffered or may suffer by reason of the alleged discriminatory practices of the defendants. These plaintiffs have standing to properly challenge the alleged racially discriminatory policies and practices of the defendant company, Avco Corporation, in the areas of (a) classification as to the types of employment available to black people, (b) training, (c) working conditions, (d) promotions, (e) transfers, (f) compensation, and (g) terminations. Plaintiffs further have standing to challenge the alleged racially discriminatory policies and practices of defendant union Aero Lodge No. 735 in allegedly unfairly, inadequately, arbitrarily, discriminatorily, and in bad faith representing the interests of black employees in these areas.

The court determines that it is not bound by the prior arbitration decisions in respect to claims of racial discrimination by plaintiff Newman and intervening plaintiff Dennis. This is true because the collective bargaining agreements which the arbitrators were authorized to interpret contain no provision forbidding racial discrimination by defendants Avco and Aero Lodge No. 735. Thus, the court should not defer to the fact finding of the arbitrators since they had no power to make findings on the issues of racial discrimination. Further, the claims of racial discrimination by plaintiff Alexander and intervening plaintiff

McCreary are not barred by any failure to exhaust contractual remedies. Even if exhaustion of contractual remedies is a condition precedent to a suit under Title VII, and this court does not so rule, the collective bargaining agreements applicable to this suit contain no remedies for racial discrimination practiced by defendant Avco. Thus, no contractual remedies were available whereby Alexander and McCreary could properly challenge any racially discriminatory actions taken against them.

*AVCO PRE–ACT BACKGROUND*

Prior to the effective date of Title VII, July 2, 1965, Avco openly practiced racial discrimination in its employment practices and working conditions. Until 1960 or so, Avco relegated the few blacks who were hired to positions of janitor and laborer. All other jobs, the more desirable ones, were reserved for white employees.

Avco did not permit black employees to eat with the white employees. Also, Avco maintained segregated toilet facilities and segregated water fountains. As a matter of practice, blacks were required to step aside and yield to white employees when the employees were lined up for whatever reason, such as to punch the time clock.

Avco supervision discouraged black employees from joining the union, advising blacks that it was to their interest not to so join. Avco supervision rarely told blacks about job openings, and offered black employees no formal or informal training.

In the middle and late 1950's, the black employees began to press for promotions. Upon hearing rumors of job openings, blacks began to apply; however, promotions for all practical purposes were controlled at the foreman, assistant superintendent and superintendent level, positions held by white personnel. When a black employee sought a promotion, he was confronted with department seniority, an adverse recommendation from his foreman, his lack of experience, his inability to pass a non-validated test—usually a non-job-related intelligence or aptitude test. In addition, Avco had established and defined in writing the job classifications in such a manner that blacks could be easily eliminated from consideration. For example, the brick and stone mason requirements called for the use of algebra, geometry and trigonometry. No successful white applicant ever answered the algebra, geometry and trigonometry questions; however, a white man held the brick mason job until he died.

Although the company did not have continuous formal training, whites were given informal on-the-job training by their fellow white employees with the knowledge and acquiescence of Avco supervisors. Blacks were not promoted because they were not provided the on-the-job training and, thus, did not have the necessary experience to qualify for the better jobs. However, whites with basically the same background as blacks were given the informal on-the-job training and promoted.

*UNION PRE–ACT BACKGROUND*

Until 1957, the defendant union was segregated all-white, except for one black, who the union considered a curiosity and a show piece. The union discouraged blacks from making application for membership. It assured blacks that their interests were best served by their remaining outside the union. In 1957, the union permitted a few black employees to become members; however, the union did not encourage them to become active in union affairs. When there were strikes, the pickets paid by the union were all white. The union did not permit its black members to walk the picket line, but required them to clean the union hall as its janitors.

Until the 1971 collective bargaining contract, effective October 16, 1971, the union did not seriously negotiate with Avco for a non-discrimination clause. The union acquiesced in and encouraged segregation and racially discriminatory practices and conditions at Avco. Union leadership felt that it was proper and not wrongful racial discrimination to hire blacks only as janitors and laborers. When black employees filed grievances when they did not receive promotions, the union usually either lost the grievances or else did not act on them in

good faith on behalf of its black members. Prior to Title VII, the union generally refused to process grievances which alleged racial discrimination.

*SENIORITY SYSTEM*

From the 1940's to 1968 Avco and the defendant union maintained departmental seniority by occupation with the provision that the airframe occupation, assembler-bench and jig, had plant-wide seniority. This seniority system applied to promotions, layoff and recall rights.

The 1968 collective bargaining contract modified the seniority system by eliminating the departmental seniority; however, it retained seniority by occupation and classification. The 1968 contract provided a more complicated promotion system. Under the new promotion system, employees desiring promotion could file with the Personnel Office job preference cards, or bids, for not more than three jobs. Under this new system, an employee in any department or occupation could bid on any jobs within the plant. However, even if the bidding employee had the most seniority under the order of priorities established, he could not get the job unless he was deemed "qualified" by Avco. For the purpose of determining "qualifications," an Avco official would interview the employee and take into consideration such factors as related experience, performance on present job, educational background, test scores and mechanical aptitude. After the interview, the Avco official would immediately advise the employee whether or not he was "qualified." If Avco deemed the applicant "qualified," his job preference for that position would then go on file. Thus, under the 1968 contract, an employee could only be promoted if Avco found him "qualified," with the amount of seniority being a secondary factor.

Assuming that the applicant-employees were found "qualified" by Avco, the promotional system worked basically as follows. The applicant-employee with the most seniority in the occupation would have the first opportunity at the job. If there was no applicant-employee in the occupation,

then the applicant-employee with the most seniority who filed a job preference card would be entitled to the job. If the job was not filled under the first two priorities, Avco would post notices seeking applications from current employees. If no "qualified" employee responded to the notices, then Avco could hire a person from off the street, i. e., a non-Avco individual.

The 1971 contract contained basically the same promotional bid system as under the 1968 contract, except that it allowed six bids, as opposed to three, to be on file. Also, the 1971 collective bargaining contract contained for the first time in Avco history a prohibition against racial discrimination by company and union. This anti-discrimination clause, Article XIV, Section 13 of the collective bargaining contract between Avco Corporation and Aero Lodge No. 735, effective October 16, 1971, provides:

> Neither the Company nor the Union shall discriminate against any employee because of race, creed, color, sex or national origin, or because of participation or non-participation in Union activity.

Plaintiff's Exhibit No. 5.

*RACIAL DISCRIMINATION AT AVCO*

On July 15, 1961, Avco filed a report (Self Analysis Form) with the President's Committee on Equal Employment Opportunity. It is most revealing. At that time Avco had a total employment of 2384. Of that number, 32 were "non-white." All of the blacks were designated as "Charwomen, Janitors and Porters."

The Self Analysis Form reveals that: (1) Avco had no black foremen; (2) Avco had no black semi-skilled employees; (3) Avco had no black skilled employees; (4) Avco had no black administrative employees; and (5) *the white employees, because of departmental seniority, were frozen in their jobs.*

Some black employees filed complaints with the President's Committee on Equal Employment Opportunity in 1962 alleging racial discrimination in employment, promotion, job training, etc.

Avco, a company holding contracts for the manufacture of airplane parts, then advised its supervisory personnel that some blacks had to be promoted.

In 1963, out of a total of 2226 Avco employees, there were 41 black male and 2 black female employees. In 1964, out of a total of 1825 employees, there were 41 black male and 2 black female employees, this being no increase in the number of black employees over 1963. In 1965, out of a total of 2553 employees, there were 91 black male and 2 black female employees, an increase of 50 black employees in one year.

In subsequent years, Avco's employment statistics were as follows:

| | Total Hourly Employees | Black Male | Black Female |
|---|---|---|---|
| February, 1966 | 2335 | 140 | 0 |
| December, 1966 | 3339 | 294 | 0 |
| October, 1967 | 2727 | 259 | 1 |
| October, 1968 | 2565 | 233 | 1 |
| January, 1969 | 2919 | 295 | 11 |
| January, 1970 | 3391 | 488 | 83 |
| February, 1971 | 3318 | 406 | 69 |
| January, 1972 | 2319 | 235 | 51 |

Approximately 16–17% of the population of the area from which Avco customarily draws a substantial majority of its employees are black. Approximately 17–18% of the population of the Nashville labor area are non-white.

As of July 9, 1971, Avco employed 725 whites in salaried jobs. Avco employed nine blacks in salaried jobs, which number includes black secretaries and clerks.

The court notes that, as of the date of the hearing of this suit, Avco had few blacks in the more desirable jobs. Of 50 engineers, Avco had one black. Avco had no black mechanic. Avco has never had a black superintendent, and did not have a black foreman until 1965. Most the black employees were concentrated in assembler-bench and jig, which is one of the less stable occupations at Avco. On layoff these employees have tended to be the first to go.

Beginning in 1961 and continuing thereafter, due to governmental pressure, federal contract compliance requirements and the Civil Rights Act of 1964, Avco has taken actions which it claims have corrected and removed the effects of past discrimination. It claims that since July 2, 1965, it has not practiced racial discrimination in any of its employment practices, policies or conditions, but has complied in good faith with the 1964 Civil Rights Act and Order No. 4, 41 C.F.R. § 60–2, Affirmative Action Programs.

Basically there are two general types of work for employees at Avco. One is incentive work, which has a production schedule with the amount of compensation determined by production of the employee or group of employees. The other is nonincentive work, the more desirable jobs of which are in maintenance, in which there are several departments, and which include such jobs as engineers, draftsmen, mechanics, brick masons, etc. Generally, there is more job stability in the Maintenance Department. By reason of departmental seniority, there have been few openings in this department, which openings were sought by both whites and blacks.

In 1962, Avco promoted five black employees from the janitor and laborer classification to press operators. Referring to the press operator job, an Avco official who advanced through the ranks to management stated: "Frankly, I doubt if I could go down in the basement and run a press. These presses make people nervous. It made Robert [plaintiff Newman] nervous."

Thus, after years as custodians and laborers, five black employees, provided a training period of only a few hours, were placed on incentive work, under pressure, operating machines which were capable of cutting off fingers or a hand. Two of the five made the grade. Three of the black employees were returned to their previous classifications, and their failure became a permanent mark of lack of ability on their work record. As to plaintiff Newman, it was used against him in the trial of this case.

From July 2, 1965, to 1968, black employees at Avco were subjected to discriminatory treatment by Avco. It was only through rumors and informal word of mouth that

black employees could learn of job openings, while Avco supervision regularly informed white employees of openings. As is obvious, black employees were competing with white employees for those jobs. It is pertinent that Avco foremen and supervisory personnel, almost all white, ascertained that white employees had qualifications which did not appear on company records. However, these same foremen and supervisory personnel considered black applicants solely on what was listed on their applications. Some of these applications had been on file for many years.

Avco supervisory personnel stated that they could not give informal on-the-job training to nonqualified employees. However, Avco supervisory personnel did give this type of informal training to white employees. Whites with less seniority than blacks were promoted to maintenance jobs even though some of those promoted were no more qualified than the blacks. Non-validated tests were given to employees who desired promotion. As previously stated, an outstanding example was the test for brick mason. Avco introduced no credible evidence to justify this test as being necessary or useful in determining whether individuals were qualified for this job. No employee who held the brick mason job passed the test. However, it was a material consideration in preventing the promotion of plaintiff Alexander. A black employee was fired because of inability to perform a particular job assignment when whites, under the same conditions, were not. When whites, with substantial seniority, could not perform a particular job because of some inability, they were moved to other jobs which they were capable of performing. Blacks were not given such opportunities.

As a requirement of the collective bargaining contract effective August 12, 1968, an Avco official in the Personnel Office, Industrial Relations Department, began to interview all applicants for promotion. In some instances the applicants were given tests. However, in many instances, significant reliance was still placed on the evaluations of Avco foremen, assistant superintendents, and superintendents. These supervisory personnel insisted that there was no racial bias in their evaluations; however, the majority of these individuals thought the segregation practiced at Avco was not racial discrimination. Despite grievances and complaints alleging racial discrimination, both in on-the-job treatment and in promotions, Avco did not make an inquiry into whether or not the subjective evaluations of the black employees by the white Avco supervisory personnel were affected by racial bias.

Avco is bound by the knowledge and actions of its supervisory personnel. These Avco personnel both knew of and participated in practices, policies and conditions of racial discrimination. Numerous oral and written complaints about the racial discrimination at the plant were made to Avco officials and supervisory personnel. However, the Avco officials and supervisory personnel generally took no effective affirmative action, either before or after the effective date of Title VII, to correct valid complaints of discriminatory treatment. Although Avco did require apologies in certain instances, it did not widely disseminate to its employees the fact of the apologies.

Some other examples of racially discriminatory treatment of black employees since the effective date of Title VII are as follows:

(1) some white supervisors cursed black employees;

(2) some white employees stated openly that they did not want to work with "niggers";

(3) white employees campaigned against a black employee for a union position, falsely asserting that the blacks were seeking and would get "super seniority" if the black was elected;

(4) white supervisory personnel assigned black employees to the more distasteful jobs; and

(5) Avco consistently allowed racially derogatory writing about blacks to remain on restroom walls, for example, "We hate niggers."

*GLOBE–WERNICKE INCIDENT*

The protestations of nondiscrimination by and the credibility of both Avco and Aero Lodge No. 735, were completely negated and destroyed by their actions in the Globe-Wernicke incident. As background, assembler-bench and jig is an assembly line occupation connected with the Avco airplane contracts. The demand for assembler-bench and jig employees fluctuates substantially, being affected by the completion of one contract and the acquisition of others. As a result of these fluctuations, these employees are generally the last to be hired and the first to be laid off at Avco. The great percentage of black employees hired after the effective date of Title VII were hired into this occupation. Seniority is defined as "length of service computed for each employee from his most recent date of employment." Thus, most employees in this occupation tend to accumulate relatively short seniority periods.

In 1971, Avco had projected that there would be a reduction of the assembler-bench and jig work force some months later between the fall of 1971 and January 1972. However, a strike took place, and the completion of a contract was delayed for a few weeks.

In the latter part of 1971, Avco phased out its Globe-Wernicke Division. None of the employees of the Globe-Wernicke Division, white or black, were qualified for the assembler-bench and jig occupation. Under the union contract, these Globe-Wernicke Division employees were not entitled to transfer to assembler-bench and jig, but were to be laid off when the Globe-Wernicke Division was phased out.

Included among the employees to be terminated by reason of the phasing out of the Globe-Wernicke Division were 73 white employees whose seniority dated from 1950 to August 12, 1960. Because of pressure from the defendant union, Avco agreed to initiate a training program to train these employees in the assembler-bench and jig occupation and then hire them into this occupa-

tion. The effect of this was to place these 73 white employees ahead of those who had accumulated less than 11 years' seniority.

As projected, Avco shortly thereafter had a cutback in personnel in assembler-bench and jig. This resulted in terminating the regular assembler-bench and jig employees and retaining the old Globe-Wernicke employees who had been on assembler-bench and jig only two or three months.

Avco attempted to justify this procedure by asserting that it was hiring bench and jig employees from the street, i. e., new employees or former employees with no seniority. The company and the union felt justified in training its old employees and hiring them instead of actually hiring new employees, even though this violated the collective bargaining contract.

In determining whether or not the defendants discriminated against black employees in the course of the Globe-Wernicke incident, the court must keep in mind the past racial discrimination practiced by both defendants. On this issue, the court finds the following. The procedure utilized violated the collective bargaining agreement in effect. Due to past racial discrimination, most black employees in assembler-bench and jig had very short seniority status. This procedure violated Avco's written affirmative action program. Avco recognized that this procedure would result in the termination of black employees legally entitled to their jobs on assembler-bench and jig. Avco, which had seniority lists in its possession, knew that a great many black employees, entitled to their jobs under the collective bargaining contract, would be terminated as a result of this procedure agreed on by Avco Corporation and Aero Lodge No. 735.

The court will now examine the effect of the procedure.* The number of employees in assembler-bench and jig on January 14, 1972, totaled 898, of which 177 were black. Avco admits that at least 52 black employees lost their jobs as a result of this proce-

---

* The Avco official who agreed to this procedure was also the company official who had the responsibility to prevent and correct racial discrimination at the Avco plant.

dure. As of this time, the number of hourly employees at Avco totaled 2319, of which 286 were black.

Thus Avco and Aero Lodge No. 735, by this procedure, eliminated a substantial percentage of Avco's black employees and only a far smaller percentage of Avco's white employees. The sum and substance of their joint action was to state that white employees are entitled to preference over black employees in the areas of job classification, working conditions, transfers, compensation and termination.

The court holds that such activity by Avco Corporation and Aero Lodge No. 735 constituted active and willful racial discrimination against black employees and union members in violation of Title VII of the Civil Rights Act of 1964.

## RAMSEY ALEXANDER

■ This black man was born on March 29, 1917, and was employed by Avco on July 31, 1951. From 1951 until March 26, 1966, he worked essentially as a laborer, although prior to his employment with Avco, he had work experience as a brick mason. All through these years he endured the segregated and discriminatory practices and policies of Avco and the union. After he had worked for a short period of time with Avco, he was assigned to work as a helper to a brick mason named Stevenson, a white employee. On this assignment, Alexander performed the work required of a brick mason. After he had performed the work of a brick mason for an extended period of time, he filed a grievance against Avco in about 1958 under Article II, Section E of the collective bargaining contract, asking to be upgraded. This contract provision provided that if an employee performs the work of a higher rated employee over a two week period, he is entitled to be upgraded to the higher rate provided he has sufficient seniority. Alexander had sufficient seniority at the time. His grievance was denied by Avco and not processed by the defendant union. Thereafter no laborer or general helper was permitted to help the brick mason for any continuous two weeks in succession.

Alexander filed a complaint with the President's Committee on Equal Employment Opportunity in 1962. This complaint resulted in Avco's elimination of certain overt discrimination and segregation. Also, Avco offered Alexander a promotion to incentive work. However, realizing that departmental seniority existed and that the more stable jobs were in maintenance, he refused the promotion. However, in 1962, Alexander and a few other black employees were promoted to the job of general helper, or helper-general, which paid only slightly more than a laborer. The duties were essentially the same menial ones as before.

Alexander remained in maintenance and applied for the next opening as a brick mason in that department on July 12, 1965. Even though he had practical experience as a brick mason, he was denied that promotion. He also applied for several jobs between July 1965, and March 1966, but to no avail. The supervisory employees of Avco could not discover that Alexander had qualifications for jobs other than laborer or general helper.

In 1965 plaintiff was offered training in the occupation of assembler-bench and jig in another department of the plant. Plaintiff declined this training, preferring to remain in the Maintenance Department. His reasoning for this decision was sound in that promotions and lay-offs were departmental in 1965. This system of promotion theoretically allowed the most senior man in a department to get first opportunity at a job vacancy. The Maintenance Department contained several jobs which paid the highest wages in the plant. Plaintiff Alexander had accumulated substantial seniority in this department. If he had transferred he would have sacrificed his competitive standing in maintenance and diminished the number and variety of jobs available to him, since most of the departments wherein assembler-bench and jig was located had only this one occupation.

The brick mason Stevenson died in July 1966, and Alexander applied for the job. Avco supervisory personnel denied him the job because of his lack of qualifications,

including a lack of knowledge of algebra, geometry and trigonometry. Knowledge of algebra, geometry and trigonometry was listed by Avco as requirements for the brick mason job. However, according to the evidence presented in this case, no brick mason had such knowledge nor answered questions dealing with such subjects on the non-validated tests given to applicants. Defendant Avco introduced no credible evidence to justify such job requirements as being necessary or useful for safe, efficient job performance as a brick mason.

Despite the brick laying experience of Alexander, Avco, through its substantially subjective evaluating procedures, denied him the job and hired a white person, a Mr. Cooper, who had not previously worked for Avco. Defendant Avco produced no credible evidence that the white person so hired possessed equal or superior qualifications to those possessed by Alexander.

Alexander, who joined the defendant union in 1957, has filed several grievances against defendant Avco, alleging that Avco failed to promote him due to racial discrimination. Defendant union, both before and after the effective date of Title VII, failed to process Alexander's grievances alleging racial discrimination. Defendant Aero Lodge No. 735 was less than vigorous in acting on Alexander's charges that Avco refused to promote him even though he possessed the requisite qualifications and seniority. Both before and after the effective date of Title VII, defendant Aero Lodge No. 735 has shown less vigor and enthusiasm in representing Alexander and other black members than it has in representing its white members.

Alexander filed a complaint with EEOC on September 8, 1965, alleging that he had been discriminatorily denied advancement. By letter dated December 13, 1965, the EEOC notified Alexander of the failure of their conciliation efforts and of his right to sue in federal court. This suit was filed on January 13, 1966. On March 26, 1966, Avco apparently discovered hidden talent in Alexander and promoted him to the position of oiler in the Maintenance Department af-

ter Alexander had filed a request for the position on March 15, 1966.

The maintenance-oiler position is not one requiring special skills or considerable training. However, the evidence shows that Avco, after attempting to discourage him from taking the job, required that Alexander take and pass a written test before he could be deemed qualified for the low-skill oiler position. Avco had not previously required other employees filling this position to take and pass such a written test. Alexander was also required to pass a "practical test," in which he was required to climb a high ladder while hot steam droppings fell on him. The credible evidence shows that Avco had not previously required white employees to pass such a "practical test." Alexander successfully passed both tests and was allowed to fill the oiler position on March 26, 1966.

The court holds that defendant Avco, by its practices in the area of promotions, engaged in racial discrimination against plaintiff Alexander in violation of Title VII of the Civil Rights Act of 1964 subsequent to the effective date of the Act.

The court further holds that defendant Aero Lodge No. 735 wrongfully discriminated against Alexander because of his race in refusing to protect Alexander's right under Title VII not to be denied promotions because of his race. Aero Lodge No. 735 discriminatorily represented Alexander in violation of Title VII, subsequent to the effective date of the Act, by providing unfair, inadequate, arbitrary, discriminatory and bad faith representation to Alexander. The representation provided by defendant union to Alexander was inferior to that representation provided to white union members.

### ROBERT F. NEWMAN

Robert F. Newman, a black man 52 years of age, was hired by Avco on May 9, 1951. He continued as an employee, except for occasional lay-offs due to reduction in force, until he was fired on February 1, 1966. From 1957 until the date of his discharge, Newman was a regular member in good standing of defendant union Aero

Lodge No. 735. Through the first eleven years of his employment, he worked in the menial occupations of laborer and general helper. During these eleven years, Newman worked under segregated and discriminatory conditions with no training, formal or informal. White employees gave other white employees, but not black employees, on-the-job training. All supervisory personnel were white.

On October 20, 1962, after he filed a complaint with the President's Committee on Equal Employment Opportunity, Newman was one of the five black employees transferred into the unnerving incentive work position of press operator, which required agility of movement and physical coordination. Newman was not offered a semi-skilled position in maintenance, but was offered this incentive position which placed in danger the worker's fingers and hands. After a minimum of instruction from a segregation-practicing foreman, Newman was expected to meet a production quota.

After approximately two weeks on the incentive job, Newman was returned to his former occupation of laborer. Newman claims he requested the return to his previous occupation because he had obtained information indicating a reduction in force in the press department. On the other hand, his supervisor stated Newman was afraid of the press and was apprehensive of injury. In any case, the foreman transferred Newman subsequent to his failure to make production.

Before discussing the last series of events which preceded his being fired, the court will analyze Newman's work record.

Newman is a large, slow talking and slow moving individual. He concedes he is slow to learn new tasks. Until 1964, Avco's primary complaint as to Newman's performance was that he was slow to learn, but that once he learned a job he could adequately perform it. Evidence was presented that Avco foremen had reprimanded Newman on occasion for talking, drinking a Coca-Cola on the job, and wasting time. However, from 1951 to 1964, so long as Newman remained a laborer, Avco was basically satisfied with his work performance.

In October, 1964, Newman was transferred at his own request to an incentive job, a stove, or range, assembly line operation in Department 380. He was assigned to crating the finished product at the end of the assembly line. The credible proof indicates that he performed this job satisfactorily. Then, as a result of a cutback in production, Newman was transferred to assembly line production in another department in June 1965. He was slow to learn, but eventually became a satisfactory employee there.

In October 1965, Avco's quantity of work increased and the stove assembly line reopened. Newman, with his many years of seniority, transferred back to Department 380. Because of his seniority, Newman would have been entitled to his previous crating job. However, a union steward, with less actual seniority, successfully claimed the crating job because of his artificial seniority due to his union position. The Avco foreman in charge of this department did not want Newman back on the crating job, stating that he felt that Newman could not perform the work. He explored the possibility of Newman's taking a demotion back to a laborer classification. Newman, however, refused the demotion. Then for some time Newman was assigned to day work as a utility man instead of being placed on the assembly line. However, a white employee, Stover, could not perform the work at position # 1 "stove lifter," on the stove line because of the extreme physical demands of the position. A less strenuous job was found for Stover in another department. Although there were several employees on the assembly line with less seniority than Newman, he was nevertheless assigned to this position on December 22, 1965. The evidence reveals that the job of stove lifter is the most physically demanding job on the stove line. It entails lifting from above the head a stove frame weighing approximately 50 pounds, placing it on the floor, performing several additional functions thereon, and then placing it on the move line for conveyance to another

station. Newman was required to repeat this process every five minutes for the entire shift.

Newman advised the foreman that he was not physically able to do the job, but was told that he would do the job or would be reported to higher company officials. On the morning of his second day as stove lifter, when Newman insisted that he was working in pain, he was taken to the front office, where Avco suspended him for three days to give him time "to think it over." On the way home from the plant on the day of his suspension, Newman had an automobile accident in which he sustained injuries to his left hip, knee and ankle. After medical treatment for several days, Newman reported back to work at Avco on January 17, 1966, but the stove line was in the midst of a two-week shutdown. On company instruction, he reported again on January 24, 1966, when the stove line was reopened. He brought a letter from his personal physician stating that he was still disabled and would be so for two more weeks. He was then sent to Avco's Director of Industrial Relations, who advised him to obtain medical evidence of his disability. Newman obtained a statement from his personal physician, dated January 24, 1966, in which the doctor stated that Newman had "apparent residual disability of some minimal degree in the left knee." He was then sent to the company doctor. Newman testified that the company doctor just observed him from a distance of several feet and stated, "There is nothing wrong with you—you are just looking for sympathy." When Newman returned to work on January 31, 1966, at the direction of the Director of Industrial Relations, he insisted that he was physically unable to perform the heavy work on station # 1 on the range line and asked to be transferred to a less physically exacting position. Avco refused his request for transfer and fired Newman on February 1, 1966, after he had worked as stove lifter for approximately a day and a half.

At the time of Newman's discharge, the defendant Avco Corporation had other jobs which plaintiff could have performed satisfactorily to which he could have been transferred. Plaintiff had in fact requested such transfer to another job which he could perform both prior to and at the time of his discharge. In the department where plaintiff was working, several white employees had been changed from one job to another within the department, or had been encouraged to seek transfer to jobs under other supervisors when they were unable to perform or were unsuitable for the particular job to which assigned. This was the general practice of the defendant Avco where white employees were concerned.

Upon being notified of plaintiff's discharge, the defendant, Aero Lodge No. 735, declined and refused to raise the plaintiff's grievance that he had been the victim of racial discrimination. Instead, the defendant union filed a grievance charging a violation of the collective bargaining contract in that the company was wrong in its contention that plaintiff failed to perform his job properly. In the hearing on this grievance, the defendant, Aero Lodge No. 735, urged that plaintiff had a right to receive at least two days of training on the new job. The defendant union refused to raise and prosecute plaintiff's grievance and contention that the defendant Avco accorded white employees privileges and prerogatives not accorded black employees, although there was considerable evidence to support the charge.

On the issue of whether or not defendants Avco and Aero Lodge No. 735 violated the Title VII rights of plaintiff Newman subsequent to the effective date of the Act, the court makes the following findings and conclusions which it believes are particularly significant:

1. Newman was one of five black employees who filed a complaint of racial discrimination against Avco with the President's Committee on Equal Employment Opportunity in 1962.

2. As was its practice, Avco did not investigate to determine whether any racially discriminatory employment practices existed as alleged in the complaint filed with the President's Committee.

3. Avco's white stove line foreman did not want Newman on the stove line.

4. The Avco stove line foreman had previously made up his mind that Newman could not do the work.

5. The Avco foreman assigned Newman to the most difficult job on the stove line, leaving employees with less seniority in the less demanding jobs.

6. The Avco foreman advanced no satisfactory explanation for Newman's assignment to the stove lifter job.

7. The Avco foreman permitted and assisted in the transfer of Newman's white predecessor, who could not physically perform the job, to a less strenuous job.

8. In the foreman's 25 years with the Avco Corporation, this was the first time he had taken an employee with Newman's number of years of seniority to the Avco front office to be fired.

9. Avco had transferred several white employees, physically incapable of performing a job, to less strenuous jobs in the past.

10. Avco had less strenuous jobs available to which Newman could have been transferred.

11. This was the first time in the company's history that Avco fired an employee with as many years of seniority as Newman possessed.

12. Aero Lodge No. 735 declined to include a charge of racial discrimination in Newman's grievance of his discharge in spite of considerable evidence that Newman was discriminatorily refused a transfer to a less strenuous position and discriminatorily discharged.

13. When Newman's private counsel amended the grievance to include a charge that Newman was fired because of racial discrimination, Aero Lodge No. 735 advised the arbitrator that it expressly disclaimed that part of the grievance.

14. Aero Lodge No. 735 refused to demand that Avco treat Newman in the same manner as it treated white employees and union members in the areas of job classification, working conditions, transfers and terminations.

The court holds that Avco's discharge of Newman and Avco's refusal to provide Newman with a less strenuous job was racially discriminatory in violation of Title VII of the Civil Rights Act of 1964. Avco discriminated against Newman in the areas of job classification, working conditions, transfers and terminations.

The court further finds that defendant Aero Lodge No. 735 unfairly, inadequately, arbitrarily, discriminatorily and in bad faith represented its member Newman in his efforts to be reinstated and in his efforts to be accorded nondiscriminatory treatment equal to the treatment afforded white employees and union members. Accordingly, the court holds that defendant Aero Lodge No. 735 discriminated against plaintiff Newman because of his race in violation of Title VII.

### INTERVENOR RAYMOND L. DENNIS

Intervening plaintiff Raymond L. Dennis, a black man, was hired by Avco on February 21, 1966, and fired on January 26, 1971. At all times during this period he was a member in good standing of Aero Lodge No. 735. Prior to his termination, his work record was generally clean except for an admonition for loitering at a soft drink machine on one occasion.

In 1970, Dennis became a board member of an organization known as the Cause-Find-Commission, formed by Avco black employees to eliminate racial discrimination existing at the Avco plant purportedly practiced by both defendant Avco and defendant Aero Lodge No. 735. The organization was formed as a result of what was felt to be an alarming rate of black employee terminations. Sometime in the fall of 1970, Dennis was elected by other employees as union committeeman of Department 928, a department in which groups of employees worked on assembly jigs in the manufacture of wings for the Lockheed L–1011 aircraft.

A union committeeman investigates complaints of the hourly employees, files grievances, and performs other duties incident to

the well-being of department employees. In this project containing approximately 1500 employees, plaintiff Dennis was the only black union committeeman on the day shift. Often, black employees would approach him and he would give them guidance and assistance. Sometimes he would direct them to the plant committeeman, to their department committeeman if they were not in his department, or to the Cause-Find-Commission.

In the fall of 1970, it came to the attention of plaintiff Dennis, in the course of his duties as a union committeeman, that three black employees who had been assigned to his department were transferred to another department in violation of their seniority rights. The seniority rights of the three should have allowed them to remain in Department 928, and employees with less seniority within the department would have ordinarily been transferred. Upon the transferring to the new department, the three black employees were "rolled" to the night shift. After the complaints were made to plaintiff Dennis, though he could not personally correct the situation since the employees were no longer in his department, he demanded an explanation from the foreman of Department 928. The foreman conceded to Dennis that the transfers were improper but attempted to justify the transfers on the ground that there were too many individuals on one side of the department working area. Shortly thereafter, two white women were transferred into the department. One of these white women was named Betty Urtubees, who had been transferred from the night shift. Night shift employees are unable to replace day shift employees unless the night employee has greater seniority. At the time of her transfer Miss Urtubees had only a few months' seniority with the company. Dennis went to the foreman again for an explanation since the arrival of these employees was inconsistent with the earlier explanation given to him. Plaintiff Dennis was not given an adequate explanation for this inconsistency.

Miss Urtubees apparently enjoyed a continuing friendship with William Honeycutt, a superintendent of the L–1011 project, which included several departments, including Department 928. This friendship was evidenced by his regular visits to talk with her while she was in her working area.

Approximately a month or so after the transfer incident, around the first week in January 1971, plaintiff Dennis encountered Superintendent Honeycutt near Department 928 reprimanding a black employee who was assigned to Dennis' department. Dennis approached the man and asked, "What is going on?" At the time, plaintiff Dennis had his union badge plainly in sight. The superintendent replied to Dennis, "None of your damn business. Are you on union time?" Plaintiff immediately secured the union plant grievanceman, returned to Honeycutt's office, where Honeycutt, in foul language, refused to apologize to the black union official for exemplifying such disrespect to him while he was carrying out his union responsibilities. Plaintiff Dennis thereafter filed a grievance against Superintendent Honeycutt. After the second step in the grievance procedure, Honeycutt signed a written apology. After pressure was exerted upon Honeycutt from higher company officials, Honeycutt was required to make an oral apology to the plaintiff.

On or about January 26, 1972, about two or three weeks after the aforesaid incident, plaintiff Dennis was fired by the defendant company on the alleged ground that he had said to two white female employees something to the effect of: "Slow down. We won't make overtime this way." A third employee, a white male, claimed that he overheard the plaintiff make this remark to one of the two females. One of the white females was Betty Urtubees.

On January 25, 1971, Honeycutt turned over to William Ashlaw, Manager of Labor Relations, three written statements from the three employees, all claiming that Dennis had made the aforesaid remarks concerning a slow-down. Thereafter, Ashlaw interviewed Dennis in the presence of other union officials, immediately suspended him and had Dennis escorted from the Avco

premises. Thereafter, Ashlaw interviewed the three informants, who reaffirmed their statements that Dennis had made remarks concerning a slow-down. Ashlaw fired Dennis on January 26, 1971.

Pursuant to an investigation by the Manager of Labor Relations, no one else in the department came forth to support the allegations of the three white employees. The defendant union also made an investigation. All members of the department, other than the accusing white employees, advised union officials that they knew of no such "slow down" statements by Dennis. This particular department had primarily black employees at the time.

A grievance was filed by the union on behalf of Dennis, and the grievance was submitted to arbitration. The arbitrator ruled in favor of the defendant company, stating that the punishment may be harsh, but noting in the decision that Dennis said in the arbitration hearing that if he made the remark, he made it jokingly. At the trial of this suit, as the court interprets his testimony, Ashlaw asserted that even if Dennis made the remark jokingly, this was grounds for firing Dennis since he was a union committeeman.

At the trial of this suit, Dennis denied making the remark. This denial went uncontroverted since the defendants failed to put on witnesses claiming the contrary. No slow down ever occurred in Department 928 during the time Dennis was employed there. No other employees had ever been fired at the Avco plant for making an alleged "slow down" remark.

The two accusing white female employees did not like blacks, having made remarks to other white employees regarding their racial hostility toward black people. Miss Urtubees, a friend of Mr. Honeycutt, the superintendent who was forced to apologize to Dennis some two to three weeks earlier, specifically disliked Dennis. Dennis had on occasion asked Miss Urtubees for dates.

The court finds that plaintiff Dennis has proven by a preponderance of the evidence that Ashlaw, who fired Dennis, was at best an innocent conduit for the racial hostilities of an Avco superintendent and at least two Avco employees. Ashlaw, who had been Manager of Labor Relations at the Nashville plant since only September 15, 1970, is chargeable with knowledge of the historical racially discriminatory background and practices of Avco. However, between September 15, 1970, and January 26, 1971, when he fired Dennis, the Manager of Labor Relations made no inquiry into the past and current racial attitudes of Avco supervisory personnel. When Honeycutt brought the three accusing statements to him, the Manager of Labor Relations suspended Dennis and dispatched him from the premises without confronting the accusing witnesses or inquiring into their credibility. The Manager of Labor Relations fired Dennis without making a serious investigation as to whether or not the accusing employees and/or the accusing superintendent had racial motivations behind their accusations. He did not inquire into past incidents and past statements which would have raised serious questions as to the motives of the accusers. He accepted without serious investigation the moral indignation expressed by the accusing employees as the reasons for their signed statements. The Manager of Labor Relations immediately accepted as true the written statements fostered, collected and delivered by racially biased supervision. Ashlaw testified that he fired Dennis without discovering that Honeycutt had been forced to both orally and in writing apologize to Dennis just a few weeks earlier in the same month, January 1971. Ashlaw testified that he had no knowledge of this recent dispute, even though Dennis filed a grievance against Honeycutt which was just recently settled at the second step of the grievance procedure. He further stated that he was not aware of any friendly relationship between Honeycutt and Miss Urtubees when he fired Dennis. The Manager of Labor Relations also testified that when he fired Dennis, he did not know of Miss Urtubees' dislike of Dennis for asking her for dates on occasion. The Manager of Labor Relations said that when he fired Dennis he was further unaware that Miss

Urtubees was one of the two white female employees who transferred from the night shift to the day shift in the fall of 1970. This transfer, which occurred after the transfer of three black employees to another department where they were promptly "rolled" to the night shift, was protested by Dennis in his role as union committeeman.

Plaintiff Dennis, as union committeeman, had been diligent and aggressive in protecting the rights of black employees in his department. The court finds that Dennis had done his job well as union committeeman and in so doing had angered and irritated Avco supervision such as the foreman of Department 928 in the Urtubees transfer incident in the fall of 1970 and Superintendent Honeycutt in the January 1971 incident in which Dennis protested the superintendent's reprimand of a black employee.

The court finds that statements such as "Slow down. We won't make overtime this way," were common expressions at the Avco plant, which statements were not and should not have been taken seriously or literally. The statements were commonly made in a joking manner and were so understood by Avco employees and Avco supervision.

The court finds that the charge of advocating a slow down was merely a pretextual basis for firing Dennis. The real reason for firing Dennis was Avco supervision's irritation and anger over Dennis' aggressive but proper representation of black employees. The court finds that Avco fired Dennis as an example to those other black employees who might be inclined to assert their rights under the collective bargaining contract and under anti-discrimination laws such as Title VII of the Civil Rights Act of 1964.

The court holds that the discharge of Raymond L. Dennis was racially discriminatory in violation of Title VII of the Civil Rights Act of 1964, specifically 42 U.S.C. § 2000e–2(a)(1).

As to defendant Aero Lodge No. 735, the court holds that it did not discriminate against plaintiff Dennis in violation of Title VII in its representation of Dennis as to his discharge by Avco Corporation.

## INTERVENOR WARNER McCREARY

■ Warner McCreary, a black male with a high school education and a few hours of college credit, was accepted by Avco as a trainee in its Aircraft Assembly School on July 5, 1966. McCreary was employed in August 1, 1966, as an assembler-bench and jig, Class C, employee. He was promoted to Class B as an assembler-bench and jig employee on November 25, 1967. He then bid for a job as a pattern maker, wood and metal, which he was awarded after taking company tests and receiving high marks. He began as a Class C employee in this pattern-making occupation in or about July 1969 and was subsequently promoted to Class B in November 1969. McCreary, the only black employee in the pattern-making occupation, was terminated because of a reduction in force in April 1971.

Plaintiff McCreary was an organizer and leader of a black organization of Avco employees known as the Cause-Find-Commission. As a leader of this organization, he engaged in many conversations and negotiations with both company and union officials in an attempt to relieve some of the many complaints of black employees at Avco Corporation and aid in eliminating racial discrimination and mistreatment. He was a member of Aero Lodge No. 735.

This employee experienced the following discriminatory treatment while working at Avco.

1. He was reprimanded by Avco supervision for talking while he worked, even though his production was good. White employees were not so reprimanded.

2. He was reprimanded for the faulty work of a white employee. When the Avco supervisor was finally convinced that a white person was at fault, this white person was not reprimanded.

3. White Avco supervision permitted criticism of white employees for talking to black employees.

4. McCreary was a candidate for plant grievance committeeman. A company man

and a union official spread rumors that if McCreary were elected it would result in "super seniority" for blacks. The Manager of Labor Relations, William H. Ashlaw, refused to take any steps to correct the situation and did not openly state to Avco employees that the rumors were false even though he knew them to be untrue.

5. McCreary, when promoted to the pattern shop as the only black therein, was hazed by the white employees. His tool box was stolen, his chain to tie down his tool box was broken, and he was pelted with clay balls. The Avco supervisor refused to take any action.

6. McCreary was called "nigger" by fellow employees and an official of defendant Aero Lodge No. 735.

7. When McCreary and other employees protested certain actions, Avco and Aero Lodge No. 735 officials referred to the blacks as "you people."

Subsequent to the firing of plaintiff Dennis on January 26, 1971, plaintiff McCreary participated in a mass walkout by some 100 or so black Avco employees in protest of the Dennis firing. The walkout lasted for about a week and a half. McCreary was suspended for thirty days, beginning with the first day of the walkout, for his part in organizing and participating in the walkout. The court holds that Avco's suspension of McCreary was not racially discriminatory in violation of Title VII, but was justified since participation in the walkout was a violation of the collective bargaining contract then in effect.

This employee, a quiet, determined and persevering individual, was terminated by reason of a reduction in force in April 1971. Plaintiff has not proven by a preponderance of the evidence that his termination was racially discriminatory or in violation of his seniority rights. Accordingly, the court holds that defendant Avco, by terminating McCreary in April 1971 did not violate the rights of the plaintiff under Title VII of the Civil Rights Act of 1964.

As to defendant Aero Lodge No. 735, the court holds that plaintiff McCreary has not proven by a preponderance of the evidence that the union violated the rights of plaintiff under Title VII. As far as the record shows, defendant union did not discriminate against plaintiff McCreary on the basis of race in its representation of the plaintiff as to his suspension and termination.

Accordingly, Warner McCreary is not entitled to injunctive relief against either defendant under Title VII.

### DISCRIMINATION AGAINST THE CLASS

■ The court concludes that subsequent to the effective date of Title VII of the Civil Rights Act of 1964, July 2, 1965, the defendant Avco racially discriminated, in violation of the Act, against the class of Avco employees represented by plaintiffs as follows:

(1) by preserving through the seniority and promotion systems past discrimination in the areas of classification as to the types of employment available to black employees, training, working conditions, promotions, transfers, compensation and terminations;

(2) by failing, through its supervisory personnel, to afford black employees the same training afforded to white employees, thereby effectively excluding black employees from opportunities for advancement to semiskilled and skilled occupations;

(3) by considering subjective and racially discriminatory evaluations of its foremen and other supervisory personnel in determining qualifications for advancement without ascertaining whether or not such evaluations were affected with racial bias; and

(4) by discriminating against black assembler-bench and jig employees in the Globe-Wernicke incident.

As to defendant Aero Lodge No. 735, the court concludes that defendant union has acquiesced and participated in these discriminatory practices of Avco, and has represented the interests of its black members unfairly, inadequately, arbitrarily, discriminatorily, and in bad faith in violation of Title VII of the Civil Rights Act of 1964.

The court has concluded that the plaintiffs and the class they represent may be afforded relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–15.

The attorneys for plaintiffs and defendants shall submit, within sixty (60) days from the entry of this memorandum, proposals stating specifically what relief is justified under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* by the findings and conclusions as stated in this memorandum.